Good morning. Before we run the clock, maybe you can tell me how you're going to divide your time. Yes, Your Honor. I'm Mr. Walsh representing Mr. Griffin, and I'm going to take 50% of the time, 10 minutes, and I'm going to reserve 2 minutes. So 8 plus 2. Okay. And are you 8 plus 2 as well? Yes. Okay. Thank you. All right. Mr. Walsh, you may proceed. Yes, may I please, Your Honor. Robert Griffin's case is completely different from all of the other defendants in this 42 defendant indictment, the Aryan Brotherhood, because his case is different because he withdrew from the Aryan Brotherhood around the end of the 1980s, around 1987, 88, and 89. He stopped all involvement with the gang. He told the prison authorities that he was no longer involved in the gang. He wrote letters to the prison authorities. He was trying to get out of the SHU, which was the solitary confinement, which confined all gang members. He put an ad in the newspaper saying he was no longer in the Aryan Brotherhood. He asked to have his tattoos removed from his body, which was denied. And then he had a 20-year record of no discipline in the prison, and essentially he wasn't involved in any gang activity at all. When he was indicted for the conspiracy on August 28, 2003, he raised the defense of withdrawal and that the statute of limitations had barred his prosecution because under the law, the RICO conspiracy carries a five-year statute of limitations. Let me ask you this. We hear a lot about in all of these cases it's blood in, blood out. And he allegedly was let out. So how was he still alive? Well, I guess the SHU kept him alive because he couldn't get out of the SHU. He was still in the SHU for 23 hours out of 24. So the government presented evidence that he was still involved, letters that he was still being held in respect, that he was part of the postal chain. And so that seemed to be in tension with what we have read in the cases, which is if you withdrew, then your life would be at risk. You would be murdered. Whereas the evidence that the government presented showed, no, he was still in good standing with other members. So why couldn't a jury reasonably determine that he had not actually withdrawn and that he was lying about it just as he had in the testimony that the government submitted? Well, that's the crux of the issue. The jury had to make all these determinations and it was our position that if you focus on that five-year period I guess that's it. If the jury had to make those determinations and they could have gone two ways, like one of the cases before, why isn't that a jury argument and not an insufficiency of the evidence argument? Because I've jumped to the prejudicial error. Whether this is prejudicial error or harmless error, we've jumped to that argument because the government has conceded that there was improper vouching in their brief, that Agent Hululani vouched for the testimony of four of those informant witnesses that were against him. And so the court has to deal with the issue of whether it was prejudicial in this case. Well, let me ask you about the vouching because I do have, my understanding is that Hululani was called by Stinson, right? As a witness. As a defense witness, yes. Yes. So, and essentially the purpose was to show with these four informants that they, that some of them had lied and, you know, to discredit the informants. But the purpose was also to discredit Hululani for using informants that had perjured themselves previously. Why did you continue to use them, right? Not necessarily, Your Honor. Well, but why, but those questions came up. Why did you continue to use them if you knew they had already perjured himself? And then he said, well, because I still believed him about this or I could corroborate about that. My view on some level is, you know, Stinson opened that, flung the bar door open and sometimes you can drive a Mack truck through and things can come in that couldn't come in otherwise because I think if you look at that broadly, Hululani was on the line too. His credibility was being questioned along with the informants because he was being questioned about why he continued to use them when in fact they had perjured themselves. They're trying to make a kind of what a, is it a Mooney-Napooey claim or using perjured testimony or all of those things too, right? Well, the defense was that the informants were lying and we were attacking their credibility. We brought out that they had criminal convictions, they wanted promises and they wanted benefits and we also brought out that they were housed together improperly so that they could compare stories in each unit and that was something that Hululani was responsible for. And so he was criticized for how he handled them and whether he continued to use them, right? Yes, but the Witherspoon case of the Ninth Circuit says that the government can never resort to vouching under an open-the-door type of response or as an invited response because vouching is just simply forbidden. It's an unfair tactic because it relies upon the prestige of the government to say these witnesses are telling the truth or relies upon But he's attacked for what he does. Why can't he explain for rehabilitation why he chose to still use them? Because he can't give a vouching reason as to why he still used them. That's the problem. So he has to make up an answer? No, he says that they made a determination to ignore the fact that he perjured himself in the Mills case and they decided to use him as a witness despite the fact that he committed perjury because he admitted his perjury and so now we're going to go forward. But they can never cross over the line and say we have other investigators that we talked to, we have police reports that we've looked at, and we've confirmed that this man is not a liar and what he's testifying in this case is true. And that's what his testimony was. He said Smith was reliable because Agent Hululani had checked out other instances where he was credible. These are instances off the record. And that's exactly what the vouching cases say you can't do. And with Harper, the testimony was flat out. Harper had not lied. I mean that's what Agent Hululani was testifying to because his testimony contained unique facts that connected him to other knowledge. And with Roach he says Roach wasn't fabricating. I mean that's the reverse term of saying that Roach was telling the truth. So Agent Hululani just flat out was telling the jury that these government informant witnesses who had long criminal records and in many cases were murderers, he was telling the jury that they're telling the truth. So if we agreed with you that there was improper vouching, and I think that you also had an argument about the way the government cross-examined the defense witness, Mr. Ayers, correct? And so if we agreed with you on those points, then the issue would be, well, were those errors, assuming they're errors, were they harmless because of the strength of the government's evidence of non-withdrawal of Mr. Griffin? Exactly, Your Honor. And all of the evidence of the early activity of gang activity in the 80s would be irrelevant to that issue. We have to look at what evidence the government had to prove that this man did not withdraw. And so they did have evidence that they presented, and then you had other evidence of withdrawal like the publication in the newspaper. And the evidence that the government presented was more about his continuing to be in the loop with various members of the Aryan Brotherhood. Why isn't that evidence sufficient, given other evidence in the record, that people who withdraw from the Aryan Brotherhood then get murdered or are put on the hit list or whatever they called in the hat? Because the defendant's evidence of withdrawal was the warden of San Quentin Prison, Robert Ayers, who was the deputy ward at Pelican Bay State Prison. He conducted an investigation using Barry O'Neill, the institutional gang investigator. And they also consulted Kara Patton, who was the- But your argument that you're making is if the warden's called by the defense that he's not subject to impeachment, whereas if he's called by the prosecutors, he is subject to impeachment, just because he's the warden, he's like any other witness. He doesn't get, you know, just because the warden says, I don't think, I don't have any evidence he's in the gang, that still doesn't mean they can't impeach him. But I mean, when you compare that to their key rebuttal witness, David Buckethead Griffin, who was a member of the Nazi lowriders, who was pressured into being a witness, on balance, you have to say it's a close case. I think it's a very strong case of withdrawal based upon the employees of the- Okay, I think we understand your argument. I've actually given you an extra minute, so I'm going to give your co-counsel his opportunity. Thank you. All right, if you can put it back to 12 for me. Thank you. Morning. Just 12 flat, not 13. Sorry, one second. Sure. All right. Thank you. Go ahead. Good morning. I'm Paul Potter. I represented Mr. Stinson at trial. Good morning, Mr. Potter. Good morning. Fine. I represented Mr. Stinson at trial. I called Agent Helulani, and I wrote the brief. And I want to talk about the vouching, but I want to start someplace else, if I might. Sure. This case is unique because of the way the original case was divided up for trial. As your honors have noted, in all of the other cases, there was a cross-racial aspect to the homicides. In this case, the homicides were committed against individuals who are identified in the indictment as co-venturers in the Aryan Brotherhood conspiracy. Now, the notice of intent to seek the death penalty clearly states that homicides were committed against the death-eligible homicides against persons, quote, other than participants in the offense. Since both decedent Rufo and decedent Marsh were participants in the offense, as described in count one, the Aryan Brotherhood RICO conspiracy, this never could have been a capital case against Mr. Stinson because he's not the physical author of anyone's demise. He's tried and convicted as an intellectual author. Therefore, trial of the case to a death-qualified jury was an absolute abuse. There's cases that are directly against you on that. No. So I think it's Buchanan and Furman say death qualification does not affect the rights of a non-capital defendant. In the case in which at least one of the charged co-defendants is legitimately death-able. So you make that distinction from those cases. But I don't see why it makes a difference. Because if the court says, look, death qualification of the jury doesn't offend the rights, doesn't violate the rights of the non-capital defendant, then I'm not sure why it matters if another defendant is being charged on a capital case. Explain to me why that distinction you make makes a difference to our analysis. If principled opposition to the death penalty is grounds to disqualify a potential juror in an absolutely non-capital case, then no Roman Catholic could sit as a juror in a drunk driving case. And that's just simply not the law. The law of Buchanan versus Kentucky and the law of Furman v. Wood is that on the facts of those cases, there was a legitimate capital defendant. But why are the rights of a non-capital defendant not violated if there's a co-defendant who's a capital defendant and they are violated if he's by himself? That's what we would have to say in order to reach the result you want. Because if you reach the result that I hear you saying, no one could sit on any criminal trial jury in this country regardless of the nature of the charge, regardless of the potential penalty, felony, or misdemeanor, if they have a principled opposition to the death penalty. And there's not one case that stands for that proposition. There's not one case that stands for the proposition that opposition to the death penalty disqualifies potential misdemeanor jurors. So if I understand you right, what you're saying is if we said that a death-qualified jury was okay for every defendant, then that would be too broad a rule and rule out people who are conscientious objectors. Is that what you're saying? Yes, it would rule out half the United States because of the demographics of our country. The Catholic Church has a principled opposition to the death penalty, and it's taught in every church. So what do I do with the language in Buchanan that says that death qualification doesn't violate the right to an impartial jury selected from a representative cross-section of the community? So the Supreme Court seems to say, that's okay, maybe they're not thinking about the Roman Catholics. The court is divorcing the language of Buchanan from the facts of Buchanan, and I don't think that should be done. I don't think constitutionally that can be done. Buchanan is as much about... So are you, I guess, but we're kind of concerned about following the Supreme Court. So the fact that you may not agree with, they can revisit their precedent, but we can't. So throw me a lifeline here. You're misreading the precedent, Your Honor, with deference and respect. But you are misreading the precedent because the precedent only exists within the context of the factual matrix from which it springs. And the factual matrix from which it springs is that there is a legitimate capital defendant in the case. There were legitimate capital defendants in this case. This case becomes inappropriate for a capital jury at the point in which Messrs. Stinson, Griffin, Terflinger, and Chance, the California group, gets separated from the main. Now there's no longer any potential defendant in our trial group who is someone who has been involved in the homicide of someone other than a participant in the offense. And it's undisputed. There are two capital Vicar Counts, Mr. Ruffo, who was strangled by government witness Healy, and Mr. Marsh, who was strangled by Latrell and Grizzle acting in concert. And the very indictment states that both Ruffo and Marsh were members of the Aryan Brotherhood. So at that point when what we've got are intellectual authors, they're not death eligible because death eligibility flows from 3591A to C and D, in which the language other than one of the participants in the offense is clear for anyone to read. So if you kill a snitch, but they're in the Aryan Brotherhood, that can't be a death eligible case? Because one of the rules is you can't be a snitch. If you kill them physically, of course it can. But Mr. Stinson and Mr. Griffin are not charged with physically laying a finger on these people. They're charged with being, for want of a better phrase, intellectual authors. And the plain language of the statute says, C, intentionally participated in an act, contemplating that the life of a person would be taken other than one of the participants in the offense, or engaged in activity, this is D now, knowing that the act created grave risk. You need to wrap up because you're over time if you want to save some time for rebuttal. All right. Only that the venue, I think, is also a very strong issue. I think I briefed it quite adequately. The death penalty jury is sort of a double mistake because the government withdrew death. But even if they hadn't, it could not, as a matter of law, been a death prosecution. Okay. I think we have your argument in mind. Even though you've used an extra minute, I'll give each of you two minutes for rebuttal. Okay. Just say your name again just so that we have it on the record. Stephen Wolfe, Your Honor. All right. Good morning again. In reverse order, the difficulty with this death qualification argument is that it's just not true, as a matter of fact or as a matter of law. The assertion is that, Your Honor seized on it, the assertion is you cannot kill a member of the Aryan Brotherhood, or you can't give that order because a member of the Aryan Brotherhood is a participant in the crime. But that's simply not so. The death-eligible counts here were the Vicar murders. But does this matter? Because the point is the government didn't pursue capital penalty against these defendants. So the question is, is it a violation of their rights to a qualified jury? I equally believe that, despite the, I guess, creativity of this argument, there's no showing that the jury that was seated wasn't impartial. And I think that's the answer to it in any event. That's the Buchanan answer, I believe. Well, how do you respond to his argument that that rule would prove too much, if it's separated from having a capital defendant, then the government could death-qualify the jury in cases that were, in all jury cases, and therefore disqualify a component of the community? One answer is that in this case, that argument wasn't made below, so that this argument is for plain error. Okay. Well, I mean, I think you don't have to be a rocket scientist. Anyone that's death-qualified a jury, which I have done both as a prosecutor and a judge, is that you do lose a few more people. You know, there are people that can sit on a misdemeanor case, or there are people that can even sit on, and I say this not in any way impugning victims, on a garden-variety murder as opposed to a murder with special circumstances or something that makes a person death-eligible. So I understand the argument that he's saying is you kind of get a different group of people that end up sitting as jurors when you death-qualify. I mean, that there are maybe, you know, if I were arguing for him, I'd say they're kind of a more steely group. I mean, they're the kind of people that are saying, okay, you know, I'm prepared to pull the trigger. You know, I'm prepared to say that this, I'm prepared to find the death penalty if you prove to me that, you know, if you prove the offenses and if you prove to me that the circumstances warrant it. I mean, it's a harder job than just deciding whether someone's guilty or not guilty, because what? You have to go through the guilt phase and then the penalty phase, right? Yes, Your Honor. So, I mean, what he's, you know, what the argument always is, is you get a group of people that prosecutors like better than defense counsel like. Your Honor, that is the argument, and, well, I don't believe it's relevant here because it would be more impressive if the government said in the misdemeanor case, Your Honor, we want to death qualify the jury. Well, if the judge said yes, that might amount to plain error. The question here, though, is was there plain error in this case? And I submit there wasn't because it was a death-eligible case despite this argument. And the other point is that while there's little dispute that the two kinds of juries differ, there's no showing. The assumption by defendants is always the death-qualified jury yields more guilty verdicts and is inaccurate. But there's never been the slightest showing that that's the case. All right. Well, there's not in this record. So what you're relying on is you're saying they were death-eligible, so there wasn't government misconduct, and Buchanan answers the question. Yes, Your Honor. All right. Why don't you talk about the venue? The venue, Your Honor, it seems plain to me that the cases which say a racketeering enterprise is a continuing crime because of the continuing nature of the enterprise and that continuing crimes under the statute, the venue statute, are allowed to be tried in any jurisdiction where the offense begins, continues, or concludes. So the spicker count, though, it has a mens rea, you know, for the purpose of improving your situation in the enterprise, and then it has the act, you know, murder here, and then the conspiracy. My concern, and this was my concern with the Saavedra case that the government cites, is that it tries to make the mens rea, or the argument would be that the mens rea is an action element. So wherever the Aryan Brotherhood conspiracies took place, so any prison anywhere, any state where there's any prison where there's the enterprise, could be an appropriate place for venue. So venue could be in Colorado. It could be in Missouri. It could be anywhere that there's a prison that the Aryan Brotherhood operates. So why doesn't that prove too much for a spicker count? Your Honor, I don't think it proves too much because it's not the instance where Suppose the suggestion were about a murder in furtherance of the A.B. enterprise on the street where the snitch that Your Honor posits had fled to South Africa, and the A.B. had a guy on the street, Ronnie Slocum or someone like that, who's not in custody, was sent there to kill him. But that's not the suggestion. Your Honor's hypothetical posits instances where the enterprise operates day in and day out in every way, in California because of the presence of Lompoc and in Northern California because of the state. So is it okay to, would you have venue to prosecute Stinson and Griffin in Lewisburg, in Colorado? And if not, why not, under your reading of the statute? Well, those are more difficult questions. They're closer questions on any analysis because I could see the court saying the federal faction and the state faction of the A.B. are indeed the same enterprise, but messages have to flow between them and venue ought to be a little more tightly bound. Well, you know, I would hate to see venue argued as like principal place of business or the nerve center, like in a civil case of where you can, you know, it clearly isn't that situation, but would Saavedra, if this court were to follow Saavedra, would that mean that these conspiracies could technically have been brought in these other states? Because certainly there is evidence of the enterprise. And so Colorado, I guess two of the three commission members of the top officials are located. So if we took Judge Callahan's principal place of business or nerve center, then any person being charged with a vicar crime for participation in the Aryan Brotherhood could have appropriate venue in Colorado. And that's how I read your argument. Your Honor, I would say that that's true as to the federal faction. I don't know that I'm willing to assert it and I needn't assert it for purposes of this case for the state faction. So that's not part of the same enterprise? Is that your position? It is, but... Then why doesn't it fit the definition under your interpretation, under the Saavedra interpretation? Because, plainly, the question of what is a continuing crime and where does an offense begin, continue, and conclude has to be a mixed question of fact and law. And as the facts become less persuasive on the question, the law seems to bulk larger. And I think there's a considerable difference, perhaps, between on this mixed question of law and fact about venue and the state and federal factions. If we don't follow Saavedra, is there enough in the indictment, pled in the indictment, that actions related to the conspiracy at issue here, the murders or the... took place in Central District or in Southern California? Oh, yes, Your Honor. Some of the more important information about the withdrawal claim, for instance, the Vicar argument is about what were counts two and three, as the indictment has encumbered, for the murders that took place in Pelican Bay. The enterprise, the conspiracy count, operated in the Central District a great deal because the Palm Hall meetings at which several people were ordered to be killed were at Chino. A lot of the withdrawal evidence took place at Chino, at the San Bernardino County West Valley Detention Center. Ron Slocum, who is the heart and soul of communication between the state and federal factions, lived in Chino right up until we arrested him there when this indictment was returned. Well, let me ask you this. If venue is defined narrowly and if the government doesn't pick the right venue and you try someone, then double jeopardy attaches and it's over, right? If you don't establish, you know, you've tried these cases already, and if the venue is not proper, they walk, right? Golly, I haven't read those cases. I would wonder whether jeopardy can attach if venue is incorrect. I don't know what the law would do. Well, jeopardy attached you. You swore a jury. I don't know. I still sort of remember, like, you know, that when I was trying cases, like venue was one of, like, the elements of the crime, and if you don't establish venue, then... Your Honor, I'm... I don't know. You got me there. I haven't done research, and lest I say something that isn't true when someone has done research... Well, I think that's why venue is... I'll ask them, but I think that's why venue is important after... I think it's a go-home-free pass. Well, in this case, because they were only convicted of, at least Griffin certainly, was only charged and convicted of the count that's conspiracy, about which I don't think they have anything at all to say on venue. It doesn't make any difference as to him, as to Griffin... I'm sorry, as to Stinson. He was convicted of all of the counts, and as to the two murders, perhaps it means we can't retry him. As to the life sentence he got for the conspiracy count, again, he hasn't made the point. He cannot succeed on the venue argument as to the conspiracy count. All right. As to vouching, the defendant argues about vouching by... So which vouching do you concede? None. All right, they said you did. Yeah, absolutely he did, but it's not so. The government's brief says there were four instances that are close to the line. I didn't write that brief, and I'm not inclined to think that any of them are vouching, but I do agree they're close to the line because they're forms of words that if they're taken by themselves from the context, they might be vouching in a suitable context. They're not vouching in this instance because none of them, when you examine the whole language, for instance, one of them is Halualani stated his opinion that he believed Brian Healy's statements about Healy's own involvement in the murder because they were statements against interest. Well, that's not vouching. There's no reference to matters outside the record. Well, was Halualani's credibility at stake? Absolutely. Your Honor is precisely right about what happened here. This was not an attack on the credibility of the witnesses. They were attacked at length when they testified themselves. This was an attack on the integrity of the government's investigation, and it's striking to me that the claim vouching is not by the prosecutor in rebuttal summation when no one gets to say anything about it. It's an attack on the credibility of a government witness called by the defense so that he can be attacked for the integrity of the investigation that he carried on, and that's not a vouching context. The quotations are not vouching acts. That assertion as to Roach, what he said when he said Roach was 99% corroborated, the full quotation is Roach testified in the grand jury and was interviewed in recorded interviews before he went to H Unit where according to the defense claim the taint took place, and then he testified after, and his testimony is supposed to be subject to attack because it's tainted. What Hulhulani said was that 99% of what he testified to after the taint, supposed taint, he had also said prior to the taint so that it is a mere factual assertion that establishes that the taint had no bearing, the alleged taint had no bearing on the testimony. Well, but an investigating officer can't get up and say, well, I believe this witness, I believe that witness, and da-da-da-da-da. Now, if it's strictly that he has been impeached for how he handled the investigation and proffering perjured testimony and is explaining why he didn't think he was offering perjured testimony at this point in time, then that may not be vouching, but that's what I'm asking. Your Honor, Judge Klausner was careful. He ruled that Hulhulani could be asked, what did you do? But he couldn't be asked, what do you believe? And the defendants, they objected when they thought Hulhulani had said, I believe, and they did not object when he said what he had done, and Judge Klausner monitored this carefully. There's an instance here in one of this court's cases from the federal appendix, but United States v. Zuniga decided August 31, 2010, in which the assertion was that it was vouching for a postal inspector to be asked, they attacked the credibility of witness X, have you found anything that witness X said to you to be false? And the postal inspector said, nothing has been proven false. And the court said, that's not vouching, because it didn't refer to extra record evidence, it didn't refer to an assertion of belief, it referred to a fact. Nothing he told us has been proven false. I submit that's what happened here,  The two of the instances were about H units, so the assertions where he said somebody had already been corroborated, he's saying again, what he did before the alleged taint compared to what he did after shows that there was no taint. The other thing that's striking is that defendants say that this is a closed case, but that's just silly on its face. The withdrawal case, the defendant, especially Griffin, has to say this is about the snitches, but it's not.  I should take it in order, they're proud that the warden of San Quentin testified that he believed Griffin was inactive, but what he said was, I conducted an investigation in 1997, maybe as late as 1998, I never looked at anything afterward, and I found that he had been inactive when he told me he dropped out in 1985. Counsel says an argument that Griffin withdrew in 1987 or 88 or 89, that's not true, that's not what he said. He told Warden Ayers, who testified that, Robert Griffin told me he left in 1985, a crucial difference because Ayers said, if you discovered him testifying to things after 1985 that demonstrably weren't true about his membership, would you find his credibility undercut? Ayers said, yes I would. The government's excerpt of record at 4272, he told me he's inactive since 1985, if I saw evidence after 1985, I would doubt Griffin's credibility and sincerity. That's bad for Griffin, because he perjured himself in 1987, saying he'd never been a member. So he published in the newspaper, I'm not a member, and he asked to have his tattoos off, and he made statements saying that, I've withdrawn, and in response you have this other evidence. Are you saying, what should he have done in order to have withdrawn? Are you saying that unless he was debriefed? No, Your Honor. It was a sham, he didn't withdraw. He never withdrew, it's as simple as that. It's not that he didn't comply with the Department of Corrections rules, it was a sham. Okay, so what's the evidence that shows that he didn't withdraw, and that it's a jury question? Ayers said, if I saw evidence after 1985, I would doubt his credibility and sincerity. Okay, so Ayers is impeached, what else? He perjured himself in 1987 about whether he'd ever been a member of the AB. Okay, so he gives inconsistent statements about his membership. I never was a member, I left in 1985, I... No, he swore in 1987 that he had never been a member. He told Lieutenant Wise in a letter March 5th, 2002, that he had been on the commission. Okay. He told... Make it snappy, you're going into overtime. Okay. There were gang membership lists found in 2001 and 2002 that still listed him as a member. There is a sham legal brief in Exhibit 45 in 1999 that the members passed around. There are two references in there. We'll make sure that Blinky gets to see this. That's the view of his fellow members in 1999. He made 168 calls while he was in the Central District of California to West Valley Detention Center. 168 calls between June of 1998 and August of 1999 to the home of Ronnie Slocum, who was the street-wise and street-living communications corridor between the state... The PIO. Federal faculty. The PIO, public information officer. Not public, he was a mail drop. Okay. He wasn't fessing up to anybody what he was doing, but he carried the... Okay, so let's just quickly wrap it up because you're over a minute over. And to say that there was prejudice lies in the face of the fact that the judge gave careful curative instructions. Two of the witnesses that are said to have been vouched for, Smith and Roche, aren't withdraw witnesses in any event. All right, I think we have your arguments in line. Do you have any additional questions? All right, thank you. All right, you each have two minutes for rebuttal. I thought it was a concession that vouching had occurred. If you look on page 21 and 22 of the brief, I quote the paragraph from the government's brief and cite the government's brief at page 80, footnote 20, where they say there are four instances that they may have crossed the line. When you crossed the line, you violated something. So it does appear there's a concession. And then specifically where the vouching occurred, if we just focus on two of the informants because I feel that they're the anti-withdrawal witnesses. One was John Harper and Hululani testified flat out. John Harper had not lied because he had checked out his credibility and the information was somehow unique. And then concerning Brian Healy, Hululani testified that Healy was not fabricating. He was not lying because we had reviewed reports of an investigation somewhere and we had spoken to the investigators. So he's talking about evidence outside of the record. Now, the court made a distinction between that it's okay for Healy to talk about what he did and to defend himself. But in United States v. Rudberg, which is cited on page 60 of the appellant's opening brief, that's a case where the FBI agent talked about the Rule 35 process and these witnesses went through the Rule 35 process and they can only get a sentence reduction if they tell truthful testimony and these persons got sentence reductions. And the court said that that was testifying through the agent to vouching. And that was improper and reversed the conviction. And on the issue, finally on the issue of whether this was prejudicial or not, a lot of the documents that they're relying on to show that he did not withdraw, these telephone records was someone in the jail where there's 5,000 people used the pay phone and called Ronnie Slocum's girlfriend's house 200 times and there's no evidence of who was on the phone. It's circumstantial that perhaps it was Robert Griffin, but this is the nature of the evidence that they tried to prove that Griffin had not withdrawn. It was very flimsy documents here and documents there that is really questionable. All right, well I think we have your arguments in mind. Thank you for your time. Thank you. Thank you. I'm going to try to go quickly. As trial lawyers, we have a certain special language that we use and that we understand. And I just want to say walking and going home for Mr. Stinson mean back to the special housing unit at Pelican Bay State Prison where he's serving an LWOP sentence. So the notion that he might walk... Well, I guess the issue would be let's not worry about that. I realize that these people are all doing other sentences, but we can't. But on Venue, am I correct that let's say he had nothing else? If Venue, if he's been tried, is it your position that if Venue isn't proper here that jeopardy is attached and that essentially an element is missing? Yes. And it's also my position that cases only have meaning attached to their factual situation and that reliance on Saavedra is inappropriate. The Saavedra case talks a lot about nobody complained about inconvenience, nobody complained about being separated hundreds of miles from witnesses. The court can take judicial notice that the federal courthouse in the southern district of New York is less than five miles as the crow flies from the federal courthouse in the eastern district of New York. You walk across the Brooklyn Bridge and there you are. And that's just not the case with investigating a case that took place in Pelican Bay in the far northern reaches of California. Good question. The indictment does say or alleges in various points that the conspiracy to murder Ruffalo and Healy occurred in Central District and elsewhere. Is that enough for Venue or why not? No, because the vicar and the facts are that the conspiracy to murder them took place within the special housing unit at Pelican Bay State Prison. Okay, so the indictment says some aspects of the conspiracy took place in Central District. But that's as the conspiracy refers to the conspiracy to murder them. That's not the counts four and five which are the vicar death eligible murders which I insist were never death eligible. Thank you for your argument. This matter will stand submitted. The court's going to take a ten minute recess and then we'll resume at that time.
judges: Rymer, Callahan, Ikuta